The second case this morning is case number 4100705 Rochester v. Young. For the appellant we have Thomas Immel for the appellate Patrick Shaw. Please proceed. Thank you, your honors. Good morning. Tom Immel for the appellant, Mr. Young. I have rather thoroughly covered in both my brief and my reply brief citations to testimony by page number that are relevant to the matter at hand, and I'm going to try not to belabor that sort of thing, assuming that you've read the briefs and that, in fact, I should pay attention to a couple of high points, given that we're limited here in our time anyway. There is a six-page order, the Order on Appeal, authored by Judge Graves, with considerable help from the plaintiff, it would seem, because she quotes almost verbatim at great length, uses the language from their post-trial pleadings. Then we have the most important part of this whole matter, a relatively concise 140-page or so transcript, I think it's called volume 7 in your record. You are not going to be able to find this six-page order in this with live witnesses and testimony. That's all I can define from this as I read it. Mr. Young sought to recover losses that he suffered as a result of having been improperly enjoined for a period of some 19 months, which resulted in a basic 20-month gap in his ability to finish constructing and then open his new hog confinement building. This being our third appeal from the same judge, we have learned the rigors that farmers face when they have to deal with citizen groups who will, at the drop of a hat, impose enormous harm upon you and then, as they have now, turn and say, well, we shouldn't have to pay for that. But we've asked that they be required to pay on the order of $257,000. I'm just going to use round numbers. And we have proven our right to that at a hearing that occurred over a full, just about a full day, back in May of 2010, 28. On that date, we called three witnesses. Mr. Young being the principal witness in terms of time consumed and subject matter covered. And he testified under oath that he paid every bill that was raised in issue. For example, that he paid $3,875 for the contractor's demobilization costs. They had to tear down their job site. They were pouring concrete when they were joined by Judge Graves. And they had to take down all their forms and get off the site. They spent money doing that. And he testified under oath that he paid, through his construction account, he was always working with a loan at Wells Fargo Bank, $42,310 because of the increased costs of the construction materials that happened while this 20-month period, 19-month period was going by. And he'd been forewarned of that by a letter that he had received from his then contractor, J.D.L. Longhorn, that he would be incurring that. The judge wouldn't allow the affidavit of the contractor into evidence, but it didn't make any difference because all the contractor had done was put Mr. Longhorn on notice that he would be looking at an additional cost. And Mr. Longhorn testified under oath and without any contradiction whatsoever from any witness or any person that he paid that money. It was paid from his construction account. Likewise, Mr. Longhorn testified that because his seed and fertilizer supplier, FS, learned that he was under injunctive order that prevented him from building his hog building, they themselves raised questions as to whether or not he was going to be a fit subject for credit would he be able to pay his bills. And so they would not let him pre-order his crop and get a line of credit at the lower rate for placing his order early, and they put him on a cash basis. And as a result of that, he incurred more than $7,000 in additional costs for seed and fertilizer. Now the court said, well, that's pretty remote from the hog business and from the construction of the building and cites a breach of contract case. Well, plain simple fact of the matter is this isn't a breach of contract case. Whether or not damages are foreseeable is not a test. This is a reimburse someone for damages he sustained as a result of what someone else did to him. And he doesn't have to have a crystal ball, nor do they, to know that there might be something that nobody expected. He didn't know he was going to get turned down for credit for his fertilizer and seed. Nobody knew that. And the judge seems to have thought that, well, because nobody knew that, then he shouldn't be able to recover it. And that's just plain wrong. Under this act, you're entitled to collect the damages that are sustained as a result of having been improperly enjoined. So he was denied the ability to prepay solely because of the injunction? That's what FS told him. They denied him and they put him on a cash basis. He testified to that with no contradiction and no objection to his testimony. This is important, too. There's a lot of points here where there never were objections to his testimony, objections that could have been dealt with. There just never were any. And so any objections were waived. For example, I thought of a number of situations where somebody might argue, well, what about the best evidence rule? Wouldn't it have been better to have some writing from the bank instead of Mr. Young? Well, maybe so. They had all the writings in Discovery. They knew what all these were, but nobody objected. So his testimony went in unobjected to, unimpeached by any kind of cross-examination, and no witnesses at all were called by the other side. So we have the sworn testimony of Mr. Young, period, in a lot of these matters. And that's just the way it is, but that's the case. And based upon that, I believe he clearly carried by the preponderance of the evidence. And for your purposes, the trial court missed the ball here by a clear manifest way to the evidence that favored Mr. Young. The contractor then charged $13,169.38 to remobilize on the site, put everything back together, clean up the excavation so they could work at it again, put up their forms, and pour the rest of the concrete. That's all their pre-remobilization costs. He incurred that. He said it was paid under oath, and that it was paid through his bank. He also incurred $15,000 plus in interest payments on his bank loan that he couldn't make while he had no financial activity going on that would permit him to make the payments. And indeed, according to his testimony, it was during this period of time that his house fell into foreclosure. He was just about put under by this circumstance. He fought his way out of that, fought his way through some illnesses, managed to survive, and has come up for air to some extent today, but he almost went under. And he did end up paying that interest to the bank, and he testified to it. And again, the other side had every opportunity to cross-examine him, had all of his records that they turned over to him in that regard. It stands uncontroverted. The big item that forms the bulk of his claim is his loss of net income in the amount of $150,000 plus. And that is a story that bears some telling, because the trial court missed a couple of important items. First of all, there's an Exhibit No. 9 that the trial court said in the end could not be admitted in evidence. It's a March 31 letter in 2008 directed to Mr. Young and his spouse from Cargill, a contractor for whom they were going to raise hogs, a man named Dan Weatherall, who was an account manager. Mr. Weatherall stated that under their contract, had they opened on March 31, 2008, Mr. Young would not have been admitted into evidence. It was not admitted into evidence. Okay, so why are we going to consider it? Because it was testified to about extensively, and the ruling to not admit it in evidence didn't matter in the end, and I'll explain why. Mr. Tim Steinkamp from Cargill testified. Mr. Weatherall was unavailable. He's off in Minnesota somewhere, still working for Cargill, but somewhere else. Mr. Steinkamp, who held the same position he did and was in charge of development of these hog facilities, testified that he and Weatherall worked together. He was very familiar with the situation, very familiar with the Young place, very familiar with the fact that there had been an injunction, and he knew that there had been a request for some input from Cargill. How much money is Young losing here over this period of time with the injunction? And he knew that a letter would be forthcoming. He testified at the hearing that he looked at the exhibit. He said, yep, that's the letter. I agree with what's in the letter. I wouldn't change a thing. I would adopt it as my own. Cargill reaffirmed the letter on the witness stand. Now, do we need the letter to be in evidence? Not really, because what was put in evidence, and without objection, was exhibit number 12, about which exhibit number 9, the letter, speaks. And there's a fee schedule. And the fee schedule provides at page 15 of the wean to finish agreement that the base pay per animal will be $3.33 per space per month. And that was converted into a yearly figure in the letter. It's $40. $40 a year per space, 3,750 spaces. Then there's a bonus provision on page 17 and 18 of the same exhibit number 12, wean to finish agreement, which provides for a spread of bonuses starting at 50 cents per animal and running up to a dollar, 75 being the middle. And that has to do with their surviving, their making weight for marketing purposes and slaughter, etc. They evaluate them. And they had, and Mr. Wetherall, in writing that letter, had assigned the full $1 bonus. And so that shows up in his letter as raising the per pig space to $41. It gives him the extra dollar. On behalf of our council made quite a fuss about the fact that, well, he assumed that he'd get the dollar bonus. And you shouldn't do that as assumptions. This is an opinion and we don't have this fellow here. And Mr. Steinkamp is sitting in front of him saying, I agree with that. And the reason I agree with it in part is because I've watched this operation, which is now going on for some 14 months since the building was finished and populated with animals. And our expectations of this have proven out true. That dollar number was the proper number to use because that's our experience over 14 months since he opened. So he stands by the number. Well, the judge says, I don't think, I don't know if the judge ever looked at exhibit number 12 because she never referred to it in her order, but she says that number nine won't be admitted in evidence, even though every word of it was retestified to by Cargill. And so I think she made a mistake in that regard. But the fact is that that letter simply summarizes Steinkamp's testimony or vice versa. And it simply reflects a mathematical calculation taken from the contract that the parties were operating under and moving it into a short letter. That's all it does. So even to have admitted it in error would have been harmless because there was already full testimony about it. But in fact, it should have been admitted because it was identified and fully supported by another with the matter. In any event, the result of all that is we established that there was a gross income figure that would have been derived over a 20-month period. This did not address the full 20 months of the injunction. It was written before we knew what it was going to be. But over the full 20 months, at the rate of $12,078.46 per month, Mr. Young would have earned gross $255,000 plus. Of course, he didn't. He didn't earn anything, even though he could have had his building been opened. What was not known at the time we even filed our claim for damages, we didn't know what his expenses were because he hadn't been opened. We then derived that number by waiting through the 14 months prior to hearing to find out what it costs to run the place. And by the way, I want to note a typo in my reply brief. I mentioned there was a phone bill. That's not true. I don't know what I was thinking when I wrote that. I can't explain that. We produced an exhibit number 14, which was introduced into evidence for the limited purposes of being illustrative. Mr. Young testified under oath as to all the figures contained in that exhibit. And I also attached it as an addendum to my reply brief just to have it handy for you rather than have to dig through the papers to find it. And it's helpful to look at it even as we speak now if you care to. Mr. Young showed up in court and the transcript reflects all of this with his electric bills once per month, 14 months worth, a single propane bill because he was billed for the entire period at once in bulk, a deceased animal. He pays $65 a month to somebody to dispose of deceased animals. It doesn't matter how many there are. His real estate tax bill, his insurance bill, and he testified that he pays his laborer $2,000 per month. His grand total of expenses were $5,265. That's his monthly take expense that he's calculated and he's figured out over 14 months. So we feel like he had a sufficient base to establish an average cost for each month. The electricity was a matter of adding up 14 utility bills for electricity and then dividing by 14. And Mr. Arnold, before you run out of time, on page 9 and 10 of your brief, you say it's well established that there are three general propositions that must be met for a claimant to award damages, but there's no citation. I'm sorry. How is that well established? Well, I'm sorry. My colleague here, Mr. Shaw, I was citing with approval his brief. He and his brief had listed the cases and I was agreeing with him, so I chose not to restate them again. But there is a body of case law and he has accurately cited it that states those three propositions. That's what we're looking for here. And I chose not to waste a lot of space agreeing with him. In other words, I beg to apologize for the short cut. So in your responses, I just need to look in his brief. Well, he and I both have been arguing those same three propositions to the courts and it's in some my other pleadings, but I didn't bother putting it in the brief. I'm sorry. That's okay. I just wanted to know why you had said that. Thank you. The fact is, and I'm running out of time, and my full 20 minutes, right? I still have five for rebuttal or that's gone. When the red light comes on, you're out of time, but until then you can continue, then you will have rebuttal. Okay. Well, in any event, I would beg the court to closely examine some of these exhibits and read the transcript, which isn't very long, and look at the citations that have been contained in my brief as the specific transcript pages where it is clear that there was full testimony provided on every one of these points. Now I am out of time. Thank you very much and I appreciate your time. Thank you. Mr. Shaw. Good morning. May it please the court. I am Patrick Shaw. I'm here on behalf of Rochester County District Attorney's Office. I'm here to report that the trial court was directed to quote, allow defendant the opportunity to prove any damages he incurred as a result of the preliminary injunction. Since that time, approximately a month or two after it was remanded, we did have a bench trial. He was given the opportunity to prove any damages. And he was able to prove $500 in damages for a EPA construction-related permit that continued as long as the construction wasn't finished. And that was an item of damages in which the legal obligation incurred was clear. It's based upon statute. I can look it up myself. And he provided us a copy of the check. We had that. I believe it was the next day. It was filed to the court. And those seem to relate because by the injunction, direct causation link was provided. As for the rest, we conducted discovery on the damages. We reviewed the suggestion of damages and it was filed by Mr. Young. And we requested from the court that the trial court be able to prove any item of damages. I requested that because I thought it would be very helpful in determining where the issues were. So the trial would go forward clearly understanding where the disagreements lay. With the exception of the attempt to change one item from lost profits to, I should say, lost revenue to lost profits, most of those objections were not recognized or addressed. And thus many of those disagreements existed prior to and during. I'm laying out this background a little bit to sort of explain this repeated suggestion I didn't object to this testimony or that testimony. We filed our objections beforehand based upon the evidence that we knew existed in the theories that he was presenting. During the trial, I objected to questions, not testimony. I objected to questions as lawyers do sometimes. But we asked for questions across examination. The judge requested that we leave our objections to the specific documents that frame the damage request until the end of the day. So we went through the exhibits and that's when the objections were sort of surrounding the items of damage and sort of coalesced. And again, those objections were continued in the post-trial brief requested by the judge to sort of put this all in perspective. We're here today to say the judge did her job. She heard the evidence and we've heard nothing today that would indicate that there was manifest error in that evaluation of the testimony heard during the bench trial. To respond to a few points that were raised here, a lot of discussion regarding Exhibit 9 that was not allowed and why it was allowed and this other exhibit that's similar was allowed. The exhibit that was allowed in was a contract proposal for agreement that Cargill had entered. I utilized that to cross-examine Representative Cargill on several points in the contract. Problems with the arguments stemming from this proposal for agreement were that they provided payments depending upon, for example, how many hogs survived. They had payment plans depending upon how much illness or how well kept the place was. There's not a fixed sum that is derived from this proposal for agreement. Cargill wants to award good behavior or it wants to pay for hogs that portion that risk back to the farmer. So there were several items in there. Doesn't Cargill pay so much per head? It pays a sum depending on how many survived, I believe. There's a survival provision in there. I'd have to double check. That was the testimony and I guess it was on page 19 of the transcript proceedings was that the number of deaths or loss of pigs while they're in Mr. Young's custody will make a difference on how much Cargill pays. I can't remember exactly how that works out though, to be honest. I mean I remember if it was a fixed number, a shifting number. Cargill wants those pigs to sell and it doesn't want Mr. Young not suggesting people are killing them. In terms of proving damages here, I mean there were no hogs because there was the injunction. So there was no way you would have to, I guess, agree that there could have been proof how many hogs would have survived, how many would have been the final number that suited Cargill's needs. Well I mean I think this is a very difficult task to prove regardless of what the evidence is because there was no existing enterprise beforehand. That was one of the alternative grounds presented by the judge. The new enterprise rule basically suggests that a new enterprise is not going to be able to prove lost profits. I don't think the new enterprise rule says never, ever, ever, but it says that without maybe one of those. It's very difficult, possibly requires an accountant, someone to look at what was going on in the industry at that time, what the contracts were going on, what were the current circumstances. Mr. Young pretty much conceded that he did not have background during the time period this letter that we're talking about was supposed to discuss. That's why he tried to change the testimony, trying to change his theory on the day of the bench trial. But under the new enterprise rule or the new business rule or whatever it's called, he pretty much would have to have already been in this business. Couldn't you look at other facilities that are similar that have about the same number of hogs? I think that's possible. Based upon that then determine what would the average profit be for a year. Yeah I mean I think that may be. But that wasn't done. That was not done. I think the courts may have suggested that. I mean I looked through that and find that's very difficult. I would probably hire an accountant if it was up to me because I'm not, you know, I'm a lawyer and I can't balance the number like that. But this is essentially what one of the cases we cited, it was a dentist did. He was precluded from getting into this practice by probably it was an argument over a covenant not to compete and he basically then had three or four years after the injunction had been lifted to say here's, you know, I have experience now in this dental practice in this area and I think it would be pretty much the same. And the court said no, you don't have it during that time period. It's too speculative. It's too remote. Obviously the idea of lost profits are just very difficult to prove. I mean that's essentially what I would take from it. There have been many cases where lost profits have not been proven to anybody's satisfaction with more than just a day's testimony on this. I think and I think it also point out that there are a number of items of evidence in which at least one of the concerns that the judge expressed was the remoteness of the damage from the which Mr. Young's attorney says is wrongfully introducing breach of contract concepts here. I've relied upon damage theory. Construction delays are common, frequent, they're frequently litigated, they're books just on the prove-up of construction delays and those delays can occur in tort, they can occur in contract, but they all come from the same sort of basic set of issues. And the most common way to get through the problems of construction delay is to take the first contract that was entered into before the delay and then when the delay is renewed, look to what changes were made to the contract because of the delay. Those can be evidenced by change orders. Those can be evidenced by a second contract with a higher determinant because circumstances could have changed between one and two. People sometimes want, once the construction starts, they want something else or maybe a new product that's available or you know something that you were doing with tin can now be done with copper, replacements are made. It's not necessarily easy. That is usually the starting point. That was not the starting point here. There are no contracts with the construction company here in evidence and what was offered in evidence, particularly on the construction delays, were opinions about what this cost might be. We're relying upon the first item of damage is a document that says we anticipate this. We anticipate five to ten percent increases. That was the day after the injunction was ordered and it was done the day before the bond was determined and what bond they would be requesting from the court. This was sort of a fairly good document to have as a lawyer to go in there and tell the judge they're going to stop this thing. It's going to cost me these kinds of figures. That document was not given to the judge as far as I know. It's not in the record, but the timing of the document, the date on it, indicates strongly that was the purpose of it. It was not a change order. It was not a new contract. It was an idea of what it might be costing you. It's similar to the second item of damages. It says on its face this item of damages is only good for another month and the injunction continued. You can see from the background of that particular document, the backup to that, that building costs go up and they go down. They go up and down for reasons that are completely, to me, ambiguous and arbitrary and hard to predict. A hurricane hits the Gulf, building material costs go way up. Next thing you know, the market is settled, price has gone back down. I mean, usually it's hard to imagine prices go down, but they do when they go like that. We have a recession. The government orders a lot of spending on roads and construction. Asphalt usage goes up. The next thing you know, the cost of shingles goes up, goes skyrocket, and then they return. Prices go back down. It is not at all, not necessarily at all unusual, strange for a building construction delay to actually save you money, if you're reasonable about it, if you work with your contractor about it. It's just, you know, it's like, what point in time were you when you made your first deal? What's the situation on the second deal? I recognize this has been difficult for Mr. Young and his anticipated, his anticipations and his plans, but the court's job isn't to reward senses or feelings or anything like that. It's to look at what the proof of damages are under the traditional damage rules that the courts have relied upon. In that case, there has been a paucity of any evidence to show with enough reasonable certainty that these were the expenses. There was nobody from, you know, the bank did not show up. The escrow agent did not show up to say, here's what I was dispersing. Here's what we agreed to disperse. Here's what we dispersed over these periods of time. In these types of complex situations, they're the ones who are in charge of making the payments. Mr. Young states pretty clearly on page 94 of the transcript of these bills. He believes his escrow agent paid him. His escrow agent wasn't there. I understand, you know, the terminology there. I paid him. I feel like I'm paying a monthly disbursement to my bank. It feels like I'm paying a lot. I probably shouldn't be paying so much. But that is not an actual measure of damages in terms of figuring out how much he would have paid had the injunction not been entered. What about the attorney's fees, Mr. Shaw? I think there were three complaints about the attorney fees. One was, and I think we've been clear about this, that there's negative authority on this. But this is the only statute that I've never been familiar with, and none has been cited to me, that in modern times has been interpreted to authorize attorney fees, when pretty much that has not been, attorney fees as understood in the American rule, has been anything but tightened and tightened over time. Do you agree that there is authority on the other side of that issue? Yes, I do. I hope that was clear, because I also cited authority saying that when they do order them, they make a lot of restrictions. It's very clear that the courts are not very, even when they have ordered them, they're not very happy with them. One of the cases that young Virginia's attorney relies upon, Landis v. Wolfe, as authorizing attorney fees, ultimately doesn't order attorney fees. They basically say, these are fees you would have incurred otherwise through the general defense of the case. And they reverse the appellate court and the trial court. That's 1903. I mean, that's, obviously you've got to, there's old law and there's new law, but I do not believe that there has been, the only other modern authority to look at this issue was an Illinois appellate court, which flagged it, I think it was the second district in the last 10 years, but said it wasn't raised, so we're not going to discuss it. I'm here raising that issue. That is truly, I guess, the one legal issue here. I think that I probably should not use manifest error as the standard. I think that was a legal issue, but there were two other issues in the attorney fee findings of the judge. One was that there was not reasonable efforts made to distinguish between the different types of legal fees that may be recoverable and not recoverable, and also that some of these legal fees were, could have been avoided had the grounds for lifting the preliminary injunction been presented in the original hearing. And the judge said she was using her equitable authority under that for that third reason. Again, those two reasons, I think, are well within stated legal propositions from Illinois courts and within the discretion of the judge hearing the evidence. And I guess, if there are no other questions, I'd just ask that the underlying court's decision be affirmed. Thank you, counsel. I'd like to just cover a couple of points quickly. With respect to the business about how the animal care is paid for, the $40 per month is in the fee schedule for handling the, per space per month, is handled in the, I'm sorry, $40 per year. That's handled in the fee schedule. Everything he talked about, about animals making weight, being not sick, not too many dead, all that's in the bonus section. That's all handled within the $1. The $40 per year is, per space, is locked in. There's no, there's no part of that that's contingent upon any specific performance of any type. So you're still renting the space if the hog is dead? Yeah. Yeah, if you put the hog in there and it dies, you're still paying for the space. That's the deal. Cargill understands that. I mean, they're shipping animals that are inherently sick to begin with. All hogs are sick when they arrive at this point, I think. Say, how much do you, how much would a water bill be for a place like this? He doesn't have one because he's got his own well. So it's built with an electric bill, pump it. He's got his own well. How about manure disposal? Doesn't have any. Waste disposal. He doesn't have any. It's all contained underneath, pumps it out into his own honey dipper, out to the field, spread it on the fields. And so that cuts his fertilizer costs, and so we're treating it as a wash. He's never billing anybody, paying anybody to haul it. He doesn't have an expense there. That's in the record? Yes, and it's also... You'd have the expense of the machinery and the fuel. Well, yeah, but again, he's putting it on his own land and he's just treating it as a wash as opposed to spending more money for fertilizer. He's just lumping it. He's not spending any money out of pocket for that specific effort because he's using that machinery for all sorts of things. For example, he might be out there putting the manure down and he also might use a chisel plow to rip the place up at the same time. I mean, it's possible to do that. In fact, they're spreading equipment out that does that very thing because it knifes it into the ground instead of spraying it so that you get better application. Plus, the side benefit is you don't get a lot of odor drifting around the neighborhood and there is a neighborhood adjacent about a quarter mile away. But in any event, this business about expertise on damages, I guess they needed... Mr. Young is, I guess, expected to have brought in an expert to divide his collected electricity bill by 14. I'm sorry, I don't understand most of their theory and the more I hear of it, the more I see problems. A new enterprise rule is fine when there's no way to find out what the business would have earned. Here, we went in with a contract that we were prevented from performing. We knew what the earnings would be. We didn't get to do it. Compare it with another facility. What other facility? How could you do better than 14 months on this facility and know exactly what it costs instead of guessing what it might cost to some other facility? This construction case example stinks to high heavens and for this very simple reason. Again, you can only measure damages by contract and this is not a contract, breach a contract case. There's all sorts of expenses here that are not governed by a contract change. They were expenses incurred like the mortgage interest, things like that. Mr. Young testified that every bill was paid. It doesn't matter whether or not Mr. Shaw agrees that the estimated building costs could have changed, he might have worked a better deal. Maybe he's, I think he's arguing he shouldn't have paid them and then suffered a mechanic sling. But that's not what he did. He paid his bills and he testified under oath that he paid the dollar amounts reflected. Every dime that he claimed he paid was paid either through his wasn't surprised because they already had that. They got that in discovery. They knew what the construction account disbursements were. The bank did not show up when they weren't asked to. We didn't need to. We could have if somebody said we need, we demand that you have somebody testify to these records that you've given us. No, they just accepted it apparently. And he testified that they were paid from his accounts. As the attorney's viewpoint, I rest on my brief. Thanks to both of you. The case is submitted. The court stands in recess.